**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

| | | |
|---|---|---|
| Orlando Quintana, | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. _____ |
| | ) | Jury Trial Demanded |
| Lieutenant Todd Gordon, | ) | |
| Officer Samantha Fillmore, | ) | |
| Officer Connor Menjares, | ) | |
| Officer Joel Santana, | ) | |
| FTO David Higgins, and | ) | |
| Hillsborough County | ) | |
| Defendants | ) | |

## PRELIMINARY STATEMENT

1.      This is a civil rights action in which Plaintiff Orlando Quintana (hereinafter "Mr. Quintana") seeks relief for Defendants' violation of his rights secured by the Civil Rights Act of 1871, 42 U.S.C. § 1983, rights secured by the Eighth and Fourteenth Amendments to the United States Constitution, and rights secured under New Hampshire law. Mr. Quintana seeks damages, both compensatory and punitive, an award of costs, interest, and attorneys' fees, and other further relief as this Court deems just and equitable.

## JURISDICTION AND VENUE

2.      This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343 over Mr. Quintana's federal causes of action arising under 42 U.S.C. § 1983 *et seq*. This Court has supplemental jurisdiction over Mr. Quintana's state law claim. *See* 28 U.S.C. § 1367.

1

3.      This Court may exercise personal jurisdiction over all Defendants because they resided or did business within the District of New Hampshire at all times relevant to this matter.

4.      Proper venue lies in the District of New Hampshire because a substantial part of the events giving rise to Mr. Quintana's claims occurred in Manchester, New Hampshire. 28 U.S.C. § 1391(b).

## JURY TRIAL DEMANDED

5.      Mr. Quintana demands a trial by jury on each of the causes of action pleaded herein.

## PARTIES

6.      Mr. Quintana is a 50-year-old resident of Manchester, New Hampshire.

7.      At all times relevant to this lawsuit, Mr. Quintana was an inmate at the Hillsborough County House of Corrections (the "Valley Street Jail," "Valley Street," or "VSJ") in Manchester, New Hampshire.

8.      Lieutenant Todd Gordon ("Lieutenant Gordon"), at all times relevant to this lawsuit, was a Lieutenant at the Hillsborough County House of Corrections. Lieutenant Gordon was, at all times relevant to this lawsuit, acting under the color of state law as a corrections officer employed by Defendant Hillsborough County. Lieutenant Gordon is being sued in his individual capacity. At all times relevant to this lawsuit, Lieutenant Gordon was and is a "person" as that term is used by 42 U.S.C. § 1983.

9.      Officer Samantha Fillmore ("Officer Fillmore"), at all times relevant to this lawsuit, was a corrections officer at the Hillsborough County House of Corrections. Officer

Fillmore was, at all times relevant to this lawsuit, acting under the color of state law as a corrections officer employed by Defendant Hillsborough County. Officer Fillmore is being sued in her individual capacity. At all times relevant to this lawsuit, Officer Fillmore was and is a "person" as that term is used by 42 U.S.C. § 1983.

10.    Officer Connor Menjares ("Officer Menjares"), at all times relevant to this lawsuit, was a corrections officer at the Hillsborough County House of Corrections. Officer Menjares was, at all times relevant to this lawsuit, acting under the color of state law as a corrections officer employed by Defendant Hillsborough County. Officer Menjares is being sued in his individual capacity. At all times relevant to this lawsuit, Officer Menjares was and is a "person" as that term is used by 42 U.S.C. § 1983.

11.    Officer Joel Santana ("Officer Santana"), at all times relevant to this lawsuit, was a corrections officer at the Hillsborough County House of Corrections. Officer Santana was, at all times relevant to this lawsuit, acting under the color of state law as a corrections officer employed by Defendant Hillsborough County. Officer Santana is being sued in his individual capacity. At all times relevant to this lawsuit, Officer Santana was and is a "person" as that term is used by 42 U.S.C. § 1983.

12.    FTO David Higgins ("FTO Higgins"), at all times relevant to this lawsuit, was a corrections officer at the Hillsborough County House of Corrections. FTO Higgins was, at all times relevant to this lawsuit, acting under the color of state law as a corrections officer employed by Defendant Hillsborough County. FTO Higgins is being sued in his individual capacity. At all times relevant to this lawsuit, FTO Higgins was and is a "person" as that term is used by 42 U.S.C. § 1983.

13.     Defendant Hillsborough County is a municipal entity created and authorized under the laws of the State of New Hampshire. It is authorized by law to operate a jail (Valley Street), through its Department of Corrections, to house inmates and detainees, with a place of business at 445 Willow Street, Manchester, New Hampshire, 03103. At all times relevant to this lawsuit, Defendant Hillsborough County was and is a "person" as that term is used by 42 U.S.C. § 1983. Defendant Hillsborough County was, at all times relevant to this lawsuit, the public employer of Defendants Lieutenant Gordon, Officer Fillmore, Officer Menjares, Officer Santana, and FTO Higgins.

## FACTS

14.     In the time period relevant to this lawsuit, Mr. Quintana served seven days in Valley Street, from January 24, 2023, through January 31, 2023, awaiting transport to the New Hampshire State Prison for Men in Concord, New Hampshire (the "Prison" or "NHSP") for a parole violation.

### Lieutenant Gordon's Threat

15.     On January 28, 2023, Mr. Quintana was housed on Unit 2A.

16.     Officer Sasha Makuj-Ford ("Officer Makuj-Ford") was assigned to Unit 2A.

17.     Officer Makuj-Ford called Lieutenant Gordon, who on that date was the "Second Floor Sergeant" for first shift, to Unit 2A to inform him of a disagreement she had with Mr. Quintana.

4

18.     Officer Makuj-Ford wrote in a memorandum, which she was ordered to write on February 7, 2023, as part of an eventual internal investigation[1], that Lieutenant Gordon went to Mr. Quintana's cell and ordered Officer Makuj-Ford to open the cell door.

19.     Lieutenant Gordon took a threatening and irate attitude towards Mr. Quintana before Mr. Quintana said anything to him.

20.     Mr. Quintana attempted to talk to Lieutenant Gordon and explain to Lieutenant Gordon that he was not trying to make trouble, by telling him that he had a job and telling him what he does for work on the outside.

21.     Lieutenant Gordon responded to Mr. Quintana, "Shut the fuck up … you fucking cunt you are not going to explain anything to me."

22.     Officer Makuj-Ford wrote in her memorandum, "LT Gordon made comments like 'your [sic] a cunt' and 'shut the fuck up' towards the inmate during their conversation."

23.     Before leaving Mr. Quintana's cell, Lieutenant Gordon told Mr. Quintana that he was going to "beat the shit out of him."

24.     Until they were ordered to as part of the eventual investigation, neither Lieutenant Gordon nor Officer Makuj-Ford wrote a report or notified a supervisor about this interaction.

<u>Transport</u>

25.     On January 31, 2023, Mr. Quintana was to be transported from VSJ to the Prison.

26.     Transport required that Mr. Quintana be escorted from the unit down to the booking area, where he would go into the property room to change over into the clothes he wore upon his arrival to VSJ, collect any property he had with him upon his arrival to VSJ,

---

[1] Valley Street's Administrative Investigation file is incorporated by reference in full herein and will be referenced and quoted throughout this complaint, as it is central to the claims.

and then be released into the custody of NHSP officials in the VSJ booking area, who would then drive him from VSJ to the Prison.

27.    On that date, Lieutenant Gordon was the "Shift Commander" for first shift.

28.    Officer Santana was assigned to Unit 2A for first shift.

29.    Officer Fillmore was responsible for inmate transports that day.

30.    Officer Santana wrote in his memorandum, which he was ordered to write on February 4, 2023, as part of the eventual internal investigation,

> On 1/31/2023 at approximately 0830 hours, I Ofc. Santana was assigned to unit 2A. At this time I called response on the radio for Inmate Quintana going to the Booking Department, Ofc. Fillmore arrived on the unit and shortly after LT. Gordon arrived on the unit also for the transport. At no time while waiting for the transport did Inmate Quintana make any threats.

31.    Officer Fillmore wrote in her memorandum, which she was ordered to write on February 2, 2023, as part of the eventual internal investigation, that she was about to place Mr. Quintana in hand restraints for the transport when Lieutenant Gordon arrived on the unit and told Officer Fillmore that he would "take over."

32.    Major Brian Martineau ("Major Martineau"), who conducted VSJ's eventual internal investigation, noted in his conclusion that "the incident that occurred days prior between Inmate Quintana that was supported by Officer Makuj-Ford's testimony appears to be the reason why Lt. Gordon went to Unit 2A to conduct the transport," and, "it is very unusual that the Acting Shift Commander would conduct a routine transport of an inmate that was being released."

6

33.     Officer Fillmore told Manchester Police[2], when she met with them on March 23, 2023, as part of their investigation of the uses of force against Mr. Quintana, that she could tell right away that Lieutenant Gordon was irritated.

34.     Mr. Quintana stood near a wall, awaiting the application of hand restraints.

35.     Mr. Quintana complied with all orders he was given before and during the application of hand restraints.

36.     Before Lieutenant Gordon placed Mr. Quintana in hand restraints, Mr. Quintana told him he had recently had surgery on his left shoulder.

37.     Lieutenant Gordon called Mr. Quintana a "bitch," placed him in hand restraints, and then slammed him into the wall, stepping forward, extending his arms, and pushing through Mr. Quintana with the full force of his weight.

38.     The below screenshots, arranged in chronological order with time stamps, are taken from surveillance video which depicts Lieutenant Gordon slamming Mr. Quintana into the wall on Unit 2A:



08:58:02          08:58:03          08:58:04

---

[2] The Manchester Police Department's redacted Probable Cause Statement for Arrest Warrant against Todd Gordon, footage which it referred to, and recordings of interviews conducted in the course of its investigation are incorporated by reference in full herein and will be referenced, depicted, and quoted throughout this complaint, as they are central to the claims.

39.    The first screenshot in the series above, with the time stamp 08:58:02, shows Mr. Quintana standing near the wall, complying with Lieutenant Gordon's orders while Lieutenant Gordon applies hand restraints.

40.    The second screenshot in the series above, with the time stamp 08:58:03, shows Lieutenant Gordon lift Mr. Quintana's arms, while Mr. Quintana is secured in hand restraints, and prepare to step forward to slam Mr. Quintana into the wall.

41.    The third screenshot in the series above, with the time stamp 08:58:04, shows Lieutenant Gordon brace himself, step forward with his right leg between Mr. Quintana's legs for maximum leverage against him, extend his right arm with his elbow against Mr. Quintana's back, put his left hand on Mr. Quintana's surgically repaired left shoulder, and slam Mr. Quintana into the wall with the full force of his weight, causing Mr. Quintana immediate and tremendous pain.

42.    At no point was Mr. Quintana resisting or moving away from Lieutenant Gordon.

43.    Lieutenant Gordon did not use reasonable force under the circumstances when he slammed Mr. Quintana into the wall on Unit 2A.

44.    Officer Fillmore, seen in the above screenshots watching the Lieutenant Gordon slam Mr. Quintana into the wall, wrote in her memorandum that Lieutenant Gordon "pressed Inmate Quintana into the wall between the kiosk and Ofc station."

45.    Officer Santana wrote that he "observed Inmate Quintana being pinned against the wall on the unit by LT. Gordon."

46.    Neither Officer Fillmore nor Officer Santana took any steps to intervene before, during, or after Lieutenant Gordon slammed Mr. Quintana into the wall on unit 2A, and until

they were ordered to as part of the eventual investigation, neither wrote a report nor notified a supervisor about the use of force.

47.     After slamming Mr. Quintana into the wall, Lieutenant Gordon told Mr. Quintana that "this is going to happen all the way to booking."

48.     Lieutenant Gordon told Mr. Quintana that where he was taking him, there were no cameras.

49.     Officer Fillmore told Manchester Police that she heard Lieutenant Gordon tell Mr. Quintana, "we're going to a place where there's no cameras."

50.     Lieutenant Gordon and Officer Fillmore took Mr. Quintana off of Unit 2A and began transporting him down to booking.

51.     When Lieutenant Gordon and Officer Fillmore took Mr. Quintana off of Unit 2A, Officer Menjares was walking in the hallway towards Units 2A and 2B.

52.     Officer Menjares wrote in his memorandum, which he was ordered to write on February 2, 2023[3], as part of the eventual internal investigation, that he heard commotion and observed Lieutenant Gordon and Officer Fillmore come off of unit 2A with Mr. Quintana.

53.     Officer Fillmore wrote in her memorandum that during the transport, "Lt Gordon told him to come find him and gave him his address[4]. At some time during this point Ofc Menjares was involved."

---

[3] Major Martineau noted, in his summary of his interview with Officer Menjares, "It took Ofc. Menjares several hours to write a simple To/From regarding this alleged incident, stating, 'It's hard to write this.'"

[4] Mr. Quintana later told Major Martineau and police the number and town of the address that Lieutenant Gordon had told him, which indeed corresponded to those for Lieutenant Gordon's home address.

54.     Officer Menjares told police, when he met with them on April 19, 2023, that he offered to Officer Fillmore to take control of Mr. Quintana, because he understood that Mr. Quintana was being transported to the property room to change clothes, and a female officer could not change out a male inmate, but Officer Fillmore declined his offer.

55.     Officer Fillmore told police that after exiting unit 2A, she had control of Mr. Quintana's left arm while Lieutenant Gordon had control of his right arm.

56.     As he and Officer Fillmore brought Mr. Quintana into the elevator, Lieutenant Gordon slammed Mr. Quintana into one of the corners of the elevator.

57.     Officer Fillmore told Manchester Police that Mr. Quintana was not resisting, being combative, or pulling away at all when Lieutenant Gordon slammed him into the corner of the elevator.

58.     The below screenshot is taken from surveillance video which depicts Lieutenant Gordon slamming Mr. Quintana into the corner of the elevator, while Officer Fillmore maintains control of Mr. Quintana's left side and Officer Menjares looks on:



59.     The above screenshot shows Lieutenant Gordon again brace himself, step towards Mr. Quintana, extend his arm with his elbow against Mr. Quintana's back, and slam him into the corner of the elevator with the force of his weight, causing him immediate and tremendous pain.

60.     Neither Officer Fillmore nor Officer Menjares took any steps to intervene before, during, or after Lieutenant Gordon slammed Mr. Quintana into the corner of the elevator, and until they were ordered to as part of the eventual investigation, neither wrote a report nor notified a supervisor about this use of force.

61.     Lieutenant Gordon did not use reasonable force under the circumstances when he slammed Mr. Quintana into the corner of the elevator.

62.     Officer Menjares wrote that after he, Lieutenant Gordon, and Officer Fillmore took Mr. Quintana off of the elevator,

> While transporting Inmate Quintana through [door] 1041 the door was still secured and Inmate Quintana's body did strike the door and the same thing happened at door 1088.

63.     Despite Officer Menjares' use of the passive voice in his memorandum, the import of his statement is clear: VSJ personnel intentionally slammed Mr. Quintana into doors 1041 and 1088 while the doors remained secured.

64.     Officer Menjares told police that doors 1041 and 1088 were both locked, were controlled by central, and were about five steps away from each other.

65.     Officer Menjares told police that it seemed to him like both Lieutenant Gordon and Officer Fillmore pushed Mr. Quintana into the doors.

11

66.    The below screenshots, arranged in chronological order with time stamps, are taken from surveillance video which depicts Lieutenant Gordon and Officer Fillmore slamming Mr. Quintana into door 1088 while the door remained secured.



08:59:43                    08:59:53                    08:49:54

67.    Officer Menjares took no steps to intervene before, during, or after Lieutenant Gordon and Officer Fillmore slammed Mr. Quintana into doors 1041 and 1088, and until he was ordered to as part of the eventual investigation, did not write a report or notify a supervisor about these uses of force.

68.    Officer Fillmore omitted mention of these third and fourth uses of force from her memorandum entirely, writing only that, "Lt. Gordon and myself walked Inmate Quintana in doors 1044 and 1088 that were secured."

69.    However, when she met with police, Officer Fillmore told them that Lieutenant Gordon pushed Mr. Quintana into both doors while Mr. Quintana was still handcuffed.

70.    Lieutenant Gordon did not use reasonable force under the circumstances when he slammed Mr. Quintana into door 1041.

71.    Officer Fillmore did not use reasonable force under the circumstances when she slammed Mr. Quintana into door 1041.

72.     Lieutenant Gordon did not use reasonable force under the circumstances when he slammed Mr. Quintana into door 1088.

73.     Officer Fillmore did not use reasonable force under the circumstances when she slammed Mr. Quintana into door 1088.

74.     Each slam, into doors 1041 and 1088, by Officer Fillmore and Lieutenant Gordon, sent Mr. Quintana surgically-repaired-shoulder-first into a locked door and caused him immediate and tremendous pain.

<u>The Property Room</u>

75.     Lieutenant Gordon, Officer Fillmore, and Officer Menjares then brought Mr. Quintana into the booking area and into then the property room off to the side in the booking area.

76.     FTO Higgins was assigned to the property room.

77.     FTO Higgins sat behind the desk in the property room.

78.     FTO Higgins was responsible for retrieving Mr. Quintana's property, including the clothes that Mr. Quintana was wearing upon his arrival to Valley Street, so that Mr. Quintana could change into those clothes for transport to NHSP.

79.     Mr. Quintana understood this room to be the "place without cameras" that Lieutenant Gordon told him he was going to take him to.

80.     When inmates were transported, they would be brought to the property room to strip, be searched, and change clothes.

81.     The property room did not have cameras.

82.     Officer Fillmore wrote in her memorandum that once they brought Mr. Quintana into the property room, "Lt. Gordon shoved him up against the far right corner of the cubby before the shower and property desk."

83.     Officer Menjares wrote that Lieutenant Gordon and Officer Fillmore "placed" Mr. Quintana "to the wall between the space of the property room's shower and in front of the property room's desk."

84.     Officer Menjares took no steps to intervene before, during, or after Lieutenant Gordon and Officer Fillmore slammed Mr. Quintana into the wall in the property room, and until he was ordered to as part of the eventual investigation, neither wrote a report nor notified a supervisor about this use of force.

85.     FTO Higgins took no steps to intervene before, during, or after Lieutenant Gordon and Officer Fillmore slammed Mr. Quintana into the wall in the property room, and until he was ordered to as part of the eventual investigation, neither wrote a report nor notified a supervisor about this use of force.

86.     Lieutenant Gordon did not use reasonable force under the circumstances when he slammed Mr. Quintana into the wall in the property room.

87.     Officer Fillmore did not use reasonable force under the circumstance when she slammed Mr. Quintana into the wall in the property room.

88.     Mr. Quintana remained handcuffed, facing the wall which Lieutenant Gordon and Officer Fillmore had slammed him into.

89.     Lieutenant Gordon then punched Mr. Quintana in the back of the head while Mr. Quintana was still handcuffed.

90.    Mr. Quintana was handcuffed, defenseless, not resisting, and not moving away.

91.    Lieutenant Gordon punched Mr. Quintana with such force that Mr. Quintana's face hit the wall in front of him, his legs felt weak and wobbled, and he drifted in and out of consciousness.

92.    Officer Fillmore told police that Mr. Quintana screamed after he was struck by Lieutenant Gordon.

93.    Officer Menjares wrote in his memorandum, "Inmate Quintana was screaming 'help he hit me.'"

94.    Officer Menjares told police that he heard Mr. Quintana yelling, "help me, help me."

95.    Mr. Quintana feared for his life, or that he would be rendered brain damaged.

96.    Mr. Quintana was handcuffed, defenseless, and knew that Lieutenant Gordon was making good on his earlier promise to "beat the shit out of him."

97.    Officer Fillmore told police that Mr. Quintana was not resisting.

98.    Officer Fillmore told police that she never told Lieutenant Gordon to stop.

99.    Officer Fillmore told police that she was "like a deer in headlights," and "just froze."

100.    Officer Fillmore told police that she did not know what to do.

101.    Officer Menjares told police that he didn't really focus and just wanted to get out of there.

102.    Officer Menjares told police, "I kind of at this point was like I wanna just go …
At that point I was like, I didn't even care … not even engaged. I was like, I just wanna go
back to work."

103.    Lieutenant Gordon did not use reasonable force under the circumstances when he
punched Mr. Quintana in the head in the property room.

104.    Officer Fillmore took no steps to intervene before, during, or after Lieutenant
Gordon punched Mr. Quintana in the head in the property room, and until she was ordered to
as part of the eventual investigation, neither wrote a report nor notified a supervisor about
this use of force.

105.    Officer Menjares took no steps to intervene before, during, or after Lieutenant
Gordon punched Mr. Quintana in the head in the property room, and until he was ordered to
as part of the eventual investigation, neither wrote a report nor notified a supervisor about
this use of force

106.    FTO Higgins took no steps to intervene before, during, or after Lieutenant Gordon
punched Mr. Quintana in the head in the property room, and until he was ordered to as part of
the eventual investigation, neither wrote a report nor notified a supervisor about this use of
force

107.    Lieutenant Gordon punched Mr. Quintana in the head a second time, while Mr.
Quintana was still handcuffed and defenseless, a few seconds after the first punch.

108.    Mr. Quintana again felt his face hit the wall in front of him and his legs wobble as
he continued to drift in and out of consciousness.

109.    Officer Fillmore told police that "Lieutenant Gordon striked [sic] him in the head like three times while he was still in the hand restraints."

110.    Officer Menjares told police that Lieutenant Gordon punched Mr. Quintana in the right side of his head at least twice.

111.    Lieutenant Gordon did not use reasonable force under the circumstances when he punched Mr. Quintana in the head in the property room for the second time.

112.    Officer Fillmore took no steps to intervene before, during, or after Lieutenant Gordon punched Mr. Quintana in the head in the property room for the second time, and until she was ordered to as part of the eventual investigation, neither wrote a report nor notified a supervisor about this use of force.

113.    Officer Menjares took no steps to intervene before, during, or after Lieutenant Gordon punched Mr. Quintana in the head in the property room for the second time, and until he was ordered to as part of the eventual investigation, neither wrote a report nor notified a supervisor about this use of force.

114.    FTO Higgins took no steps to intervene before, during, or after Lieutenant Gordon punched Mr. Quintana in the head in the property room for the second time, and until he was ordered to as part of the eventual investigation, neither wrote a report nor notified a supervisor about this use of force

115.    Officer Menjares told police, "Mind you, this is a guy that's a shift commander. I'm a very low level, entry officer, I just kind of … I don't know, it was very awkward for me, like I said, I didn't even know what to do, I kind of just was like, what the hell? Why am I even here?"

116.    Lieutenant Gordon told Mr. Quintana, as he was removing his handcuffs after punching him, something to the effect of, "I just dare you to move."

117.    Officer Fillmore added something to the effect of, "yeah, because if you do, we're going to fuck you up."

118.    Officer Fillmore confirmed in her memorandum that she threatened Mr. Quintana after Lieutenant Gordon had punched him, writing, "After this Lt Gordon was taking Inmate Quintana out of hand restraints and I stated at this time, 'If you try anything you're getting fucked up.'"

119.    Lieutenant Gordon instructed FTO Higgins to retrieve Mr. Quintana's clothes before removing his handcuffs.

120.    After his handcuffs were removed, Mr. Quintana changed over into his clothes.

121.    After allowing Mr. Quintana to change, Lieutenant Gordon stated something to the effect of, "Get him out of here before I fucking kill him."

<u>Release to NHSP</u>

122.    After exiting the property room, Mr. Quintana approached NHSP officials, who were present in the booking area, and asked if he was in their custody and no longer in VSJ custody.

123.    The NHSP officials in the booking area confirmed that Mr. Quintana was in their custody and no longer in VSJ custody.

124.    Once in NHSP custody, Mr. Quintana immediately began describing the uses of force against him.

125.    In addition to Lieutenant Gordon, Officer Fillmore, and Officer Menjares, the following VSJ personnel were present in the booking area and heard Mr. Quintana say that Lieutenant Gordon hit him:

      a.    Sergeant Thomas Brooks, who stated that he heard Mr. Quintana say, "I have a concussion, I got hit in the head."

      b.    FTO Rafael Gutierrez.

      c.    Sergeant Timothy Consodine.

      d.    Dr. Paul Harris, who stated that he heard Mr. Quintana say that Lieutenant Gordon punched him in the head.

      e.    Christine Melnick, who stated that she recalled Mr. Quintana claiming that Lieutenant Gordon punched him in the head, and that she heard Lieutenant Gordon say something to the effect of, "You know where I live," to Lieutenant Gordon.

      f.    D.O. Robert Bourgeois, who stated that he saw Mr. Quintana exit the property room, say, "He hit me," and turn to Lieutenant Gordon.

126.    Video from the booking area shows a number of VSJ personnel in the area while Mr. Quintana animatedly described the uses of force.

127.    Mr. Quintana nonetheless complied with each and every order given to him by NHSP officials while he was in their custody.

128.    NHSP Officer Brandon Westgate ("Officer Westgate") confirmed in his interview with police that Mr. Quintana complied with all of the NHSP officials' orders, was not an aggressor, did not resist, and "was absolutely compliant with us."

129.     The below screenshot is taken from surveillance video which shows Mr.
Quintana, standing next to NHSP personnel while in their custody, shouting about the uses of
force while Lieutenant Gordon walks away from him and a number of VSJ Personnel look
on:



130.     Lieutenant Gordon then turned and moved towards Mr. Quintana in an aggressive
manner.

131.     Lieutenant Gordon pulled down his mask, told Mr. Quintana to get a good look at
his face, and told Mr. Quintana his home address again in an invitation to fight outside of
Valley Street.

132.     Lieutenant Gordon drew his Oleoresin Capsicum ("OC") spray while approaching
Mr. Quintana.

133.     Officer Menjares wrote in his memorandum, "Lt. Gordon then walked toward
Inmate Quintana and stated an address out of Dracut, MA multiple times and said he can find
him at that address but he won't because he's a bitch."

20

134.    Lieutenant Gordon later told Major Martineau and Captain Thomas Fitzpatrick, as part of the eventual internal investigation, that he closed distance with Mr. Quintana while Mr. Quintana was in the custody of NHSP because Mr. Quintana was not against the wall to be placed in hand restraints.

135.    At all times relevant to this complaint, VSJ had no policy dictating where an inmate must be positioned prior to being placed in hand restraints by another agency.

136.    Major Martineau wrote in VSJ's eventual internal investigation, that in reviewing the footage, "Lt. Gordon does approach Inmate Quintana in an aggressive manner with his OC drawn out of his holster when Inmate Quintana is in custody of the NHSP."

137.    Major Martineau concluded that Lieutenant Gordon "appeared to be the aggressor – closing distance drawing his OC spray on Inmate Quintana while he was in the custody of the NHSP[.]"

138.    The below screenshots, arranged in chronological order, are taken from surveillance video which shows Lieutenant Gordon aggressively approaching Mr. Quintana, who took a bladed stance to protect himself, as numerous VSJ personnel look on and take no action:







139.    None of the VSJ personnel present made any move to stop Lieutenant Gordon.

140.    NHSP officers intervened and stood in front of Mr. Quintana to prevent contact.

141.    None of the VSJ personnel who were present in the booking area, who heard Mr. Quintana describe the uses of force, or who witnessed Lieutenant Gordon approach him aggressively, draw his OC spray, and invite Mr. Quintana to fight him outside of Valley Street, wrote a report nor notified a supervisor about anything that they saw, heard, or did, until they were ordered to as part of the eventual investigation.

<u>Mr. Quintana's Injuries</u>

142.    When NHSP officers put Mr. Quintana in the back seat of the transport van, he began crying and told them that Lieutenant Gordon punched him in the head.

23

143.    Mr. Quintana was transported by the NHSP officers to the Prison, in Concord, New Hampshire.

144.    When Mr. Quintana arrived at the Prison, he was unconscious in the back of the transport van.

145.    NHSP personnel called for nurses and an ambulance.

146.    When Mr. Quintana came to, he was afraid – NHSP personnel reported that Mr. Quintana was crying and confused, yelling, "don't hurt me," and "you're going to beat me up."

147.    NHSP personnel and paramedics moved Mr. Quintana onto a stretcher and into the ambulance.

148.    Mr. Quintana was crying, in obvious pain and discomfort, while he spoke to NHSP personnel and paramedics in the ambulance, telling them, "I got hit twice in my fucking head."

149.    Mr. Quintana was transported to Concord Hospital, where he was examined and treated for pain and trauma to his head, neck, and shoulder from the uses of force.

150.    Major Marineau concluded in VSJ's internal investigation that Mr. Quintana's medical records "support his assault claims regarding the alleged assault."

<u>NHSP, not VSJ, Reports the Uses of Force</u>

151.    NHSP personnel arrived at Valley Street for transport at 8:45 a.m.

152.    Lieutenant Gordon's first use of force against Mr. Quintana, when he slammed him into the wall on unit 2A, occurred at 8:58 a.m.

153.    NHSP officers took custody of Mr. Quintana in the booking area at 9:06 a.m., and immediately learned of the uses of force Mr. Quintana was subjected to, and then witnessed Lieutenant Gordon's out-of-control behavior in the booking area.

154.    They notified their supervisor of these incidents at 9:35 a.m., when they arrived at NHSP, and all NHSP personnel involved in the events, either at VSJ or at NHSP, submitted their written statements, describing what they saw, what actions they took, and what Mr. Quintana told them, by 2:00 p.m.

155.    The next day, February 1, 2023, New Hampshire Department of Corrections Commissioner Helen Hanks ("Commissioner Hanks") wrote a letter to Hillsborough County Department of Corrections Superintendent Joseph Costanzo ("Superintendent Costanzo"), informing Superintendent Costanzo that NHSP received information about the uses of force and submitting the case for review by VSJ and other agencies.

156.    Upon information and belief, Commissioner Hanks' letter constituted the first written notice to Superintendent Costanzo of the uses of force.

<u>VSJ Policies</u>

157.    At all times relevant to this lawsuit, Valley Street Jail had a Use of Force Policy which required that all staff members who use force or witness the use of force against an inmate must write a report detailing the incident and forward it to the Captain of Security.

158.    VSJ Policy requires that written reports be submitted to the Superintendent by the end of a shift during which a use of force to control inmates occurs.

159.    VSJ Policy requires that reports contain accurate and detailed information about the use of force, the events leading up to it, and the actions taken.

### VSJ Personnel's Failure to Report

160.    Lieutenant Gordon did not report any of his uses of force against Mr. Quintana.

161.    Lieutenant Gordon was ordered to write a memorandum on February 2, 2023, as part of the eventual internal investigation, in which he stated, "I did not assault the inmate in Property, during transport, or after transport."

162.    Officer Fillmore did not report any of Lieutenant Gordon's or her own uses of force against Mr. Quintana.

163.    Officer Fillmore told police that later during the day on January 31, 2023, while the two of them were in the employee elevator, Lieutenant Gordon told her not to tell anyone about what happened, and to "keep that between us."

164.    Before Lieutenant Gordon told her not to tell anyone, Officer Fillmore told Officer Nikeisha Yrrizarry that she was involved in a use of force with Lieutenant Gordon.

165.    Officer Yrrizarry did not report what Officer Fillmore told her.

166.    Officer Yrrizarry later stated during VSJ's eventual investigation that Officer Fillmore was pretty "amped up" and her ears were red, but Officer Yrrizarry did not think much of it and never mentioned it to another staff member.

167.    Officer Menjares did not report any of Lieutenant Gordon's or Officer Fillmore's uses of force against Mr. Quintana.

168.    Officer Menjares told police, "I just went back to my unit."

169.    Officer Menjares told police, "I have only ever written a report if a supervisor told me to. I never, like, ever did that, it was always like, a Sergeant would tell you or a

Lieutenant would tell you, that's how it always was for me since I was there … If nobody ever told me to, I never, never did."

170.    Officer Menjares worked at Valley Street for two years, before resigning on February 3, 2023.

171.    FTO Higgins initially claimed, during VSJ's eventual internal investigation, that he was in the property room for the entire duration of the property room search and that at no time did he witness Lieutenant Gordon use force on Mr. Quintana, before he later changed his story and claimed that he was not present when Mr. Quintana was initially brought into the property room.

172.    No VSJ personnel formally reported any use of force on Mr. Quintana on January 31, 2023.

173.    No VSJ personnel formally reported hearing Mr. Quintana describe the uses of force on January 31, 2023.

174.    A minimum of thirteen VSJ personnel, including two Sergeants, a Doctor, and of course Lieutenant Gordon, the Shift Commander, had knowledge of the uses of force on January 31, 2023, and did absolutely nothing to report them.

175.    Sergeant Timothy Consodine told police that after Mr. Quintana left the booking area with NHSP, he joked with Lieutenant Gordon, telling police, "I think I talked to him like briefly after as more of a like, you know, hey man, like, you got like two weeks left … I made a comment like you're two weeks left man, cause I know he was close to retirement."

176.    Superintendent Castonzo did not receive a written report about the uses of force until Commissioner Helen Hanks of the NH State Prison wrote to him on February 1, 2023,

to inform him that Mr. Quintana told NHSP personnel about the uses of force and to submit the case for review.

177.    After the conclusion of the police investigation, Lieutenant Gordon was indicted on five counts of simple assault, as well as one count of witness tampering, before pleading guilty to two counts of simple assault.

## COUNT I
## 42 U.S.C. § 1983 – EXCESSIVE FORCE
## (AGAINST LIEUTENANT GORDON AND OFFICER FILLMORE)

178.    Mr. Quintana incorporates by reference, as if set forth fully herein, all other paragraphs of this complaint.

179.    Lieutenant Gordon and Officer Fillmore, at all times relevant, were employees and/or agents of the Department of Corrections of Defendant Hillsborough County, and were acting under color of state law in the course and scope of their duties and functions.

180.    Lieutenant Gordon and Officer Fillmore acted in violation of Mr. Quintana's Eighth and Fourteenth Amendment Rights under the United States Constitution.

181.    Mr. Quintana, like all persons detained in a correctional facility, has the constitutional right to be free from excessive force.

182.    The right to be free from excessive force in a correctional facility is a clearly established right.

183.    Under 42 U.S.C. § 1983, every person acting under color of state law who deprives another person of his or her constitutional rights is liable at law and in equity.

184.    Each use of force by Lieutenant Gordon and Officer Fillmore against Mr. Quintana was objectively unreasonable.

185.    The uses of force were not rationally related to any legitimate governmental objective.

186.    Lieutenant Gordon's use of force, when he slammed Mr. Quintana into the wall on Unit 2A after placing him in hand restraints, was objectively unreasonable and excessive, caused Mr. Quintana injury and pain, and was applied maliciously.

187.    Lieutenant Gordon's use of force, when he slammed Mr. Quintana into the corner of the elevator during the transport to booking, was objectively unreasonable and excessive, caused Mr. Quintana injury and pain, and was applied maliciously.

188.    Lieutenant Gordon's and Officer Fillmore's uses of force, when they slammed Mr. Quintana into door 1041, were objectively unreasonable and excessive, caused Mr. Quintana injury and pain, and were applied maliciously.

189.    Lieutenant Gordon's and Officer Fillmore's uses of force, when they slammed Mr. Quintana into door 1088, were objectively unreasonable and excessive, caused Mr. Quintana injury and pain, and were applied maliciously.

190.    Lieutenant Gordon's and Officer Fillmore's uses of force, when they slammed Mr. Quintana into the wall in the property room were objectively unreasonable and excessive, caused Mr. Quintana injury and pain, and were applied maliciously.

191.    Lieutenant Gordon's use of force, when he punched Mr. Quintana in the head in the property room for the first time, was objectively unreasonable and excessive, caused Mr. Quintana injury and pain, and was applied maliciously.

192. Lieutenant Gordon's use of force, when he punched Mr. Quintana in the head in the property room for the second time, was objectively unreasonable and excessive, caused Mr. Quintana injury and pain, and was applied maliciously.

193. A reasonable officer in Lieutenant Gordon's and Office Fillmore's positions would have known that their acts and omissions violated clearly established law guaranteeing the right to be free from excessive force in a correctional facility under the United States Constitution.

194. Lieutenant Gordon's and Officer Fillmore's uses of unreasonable and excessive force were the direct and proximate cause of the violations of Mr. Quintana's constitutional rights and resulted in bodily injury, pain, suffering, mental distress, anguish, humiliation, and medical and other expenses.

195. The conduct and the action of Lieutenant Gordon and Officer Fillmore, acting under color of state law using excessive force upon Mr. Quintana, was done intentionally and maliciously, and was designed to and did cause physical injury, pain, and suffering in violation of Mr. Quintana's constitutional rights.

### COUNT II
### 42 U.S.C. § 1983 – EXCESSIVE FORCE
### (SUPERVISORY LIABILITY, PRIMARY VIOLATOR)
### (AGAINST LIEUTENANT GORDON)

196. Mr. Quintana incorporates by reference, as if set forth fully herein, all other paragraphs of this complaint.

197. Lieutenant Gordon, at all times relevant, was an employee and/or agent of the Department of Corrections of Defendant Hillsborough County, and was acting under color of state law in the course and scope of his duties and functions.

198.    Lieutenant Gordon planned, facilitated, perpetrated, encouraged, and supervised excessive and unreasonable uses of force against Mr. Quintana, in violation of the Eighth and Fourteenth Amendments.

199.    Lieutenant Gordon was VSJ's Shift Commander for the shift during which the excessive and unreasonable uses of force against Mr. Quintana occurred.

200.    Lieutenant Gordon was a primary violator and a direct participant in the uses of excessive and unreasonable force against Mr. Quintana.

201.    Lieutenant Gordon also demonstrated deliberate indifference to conduct by other officers which was itself violative of Mr. Quintana's constitutional rights.

202.    Lieutenant Gordon committed acts and omissions which set in motion a series of acts and omissions by himself and others which Lieutenant Gordon knew or should have known could cause others to inflict constitutional injury upon Mr. Quintana.

203.    "One way in which a supervisor's behavior may come within this rule is by formulating a policy, or engaging in a custom, that leads to the challenged occurrence." *Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 582 (1st Cir. 1994).

204.    Lieutenant Gordon created a culture and custom whereby his subordinate officers were discouraged from intervening to prevent uses of excessive force or reporting uses of force.

205.    Moreover, Lieutenant Gordon created a culture and custom whereby his subordinate officers were encouraged to join in upon his uses of excessive force and also use excessive force.

206.     There is an affirmative link between the acts and omissions of Lieutenant Gordon and the ensuing uses of excessive force against Mr. Quintana.

207.     Lieutenant Gordon failed to report any of his or other officers' uses of force against Mr. Quintana, and moreover instructed Officer Fillmore to remain silent, demonstrating approval and ratification of the conduct.

208.     Lieutenant Gordon's acts and omissions were the direct and proximate cause of the violations of Mr. Quintana's constitutional rights and resulted in bodily injury, pain, suffering, mental distress, anguish, humiliation, and medical and other expenses.

209.     The acts and omissions of Lieutenant Gordon, acting under color of state law, were made intentionally and maliciously and were designed to and did cause physical injury, pain, and suffering in violation of Mr. Quintana's constitutional rights.

## COUNT III
### 42 U.S.C. § 1983 – FAILURE TO INTERVENE
### (AGAINST LIEUTENANT GORDON, OFFICER FILLMORE, OFFICER MENJARES, OFFICER SANTANA, AND FTO HIGGINS)

210.     Mr. Quintana incorporates by reference, as if set forth fully herein, all other paragraphs of this complaint.

211.     Lieutenant Gordon, Officer Fillmore, Officer Menjares, Officer Santana, and FTO Higgins, at all times relevant, were employees and/or agents of the Department of Corrections of Defendant Hillsborough County, and were acting under color of state law in the course and scope of their duties and functions.

212.     During the events described above, Lieutenant Gordon, Officer Fillmore, Officer Menjares, Officer Santana, and FTO Higgins failed to intervene to prevent the violation of

32

Mr. Quintana's Eighth and Fourteenth Amendment rights, even though they had the opportunity and duty to do so. *See Davis v. Rennie*, 264 F.3d 86, 97 (1st Cir. 2001).

213.    As alleged in Counts I and II, Lieutenant Gordon and Officer Fillmore used unreasonable and excessive force against Mr. Quintana, violating Mr. Quintana's Eighth and Fourteenth Amendment rights.

214.    Lieutenant Gordon, Officer Fillmore, Officer Menjares, Officer Santana, and FTO Higgins each were physically present during the use of excessive force against Mr. Quintana.

215.    Lieutenant Gordon, Officer Fillmore, Officer Menjares, Officer Santana, and FTO Higgins each actually observed the use of excessive force against Mr. Quintana.

216.    Lieutenant Gordon, Officer Fillmore, Officer Menjares, Officer Santana, and FTO Higgins each were in a position to realistically prevent the use of excessive force against Mr. Quintana.

217.    Lieutenant Gordon, Officer Fillmore, Officer Menjares, Officer Santana, and FTO Higgins each had sufficient time available to prevent the use of excessive force against Mr. Quintana.

218.    Lieutenant Gordon was physically present during and actually observed Officer Fillmore's uses of excessive force against Mr. Quintana when she slammed Mr. Quintana into doors 1041 and 1088 and against the wall in the property room, and not only did Lieutenant Gordon fail to intervene, but he acted in concert with Officer Fillmore in perpetrating these uses of excessive force.

219.    Officer Fillmore was physically present during and actually observed all of Lieutenant Gordon's uses of excessive force against Mr. Quintana when he slammed Mr.

Quintana into the wall on Unit 2A, into the corner of the elevator, into doors 1041 and 1088, and against the wall in the property room, and when Lieutenant Gordon punched Mr. Quintana in the head in the property room, and not only did Lieutenant Gordon fail to intervene, but she acted in concert with Officer Fillmore in slamming Mr. Quintana into doors 1041 and 1088 and against the wall in the property room and taunting and threatening him after Lieutenant Gordon punched him in the head in the property room.

220.    Officer Menjares was physically present during and actually observed Lieutenant Gordon's uses of excessive force against Mr. Quintana when he slammed Mr. into the corner of the elevator, Lieutenant Gordon's and Officer Fillmore's uses of excessive force when they slammed Mr. Quintana into doors 1041 and 1088, and against the wall in the property room, and Lieutenant Gordon's uses of excessive force when he punched Mr. Quintana in the head in the property room, and did nothing to attempt to stop any of these acts.

221.    Officer Santana was physically present during and actually observed Lieutenant Gordon's use of excessive force against Mr. Quintana when he slammed Mr. Quintana into the wall on Unit 2A and did nothing to attempt to stop his acts.

222.    FTO Higgins was physically present during and actually observed Lieutenant Gordon's and Officer Fillmore's uses of excessive force against Mr. Quintana when they slammed Mr. Quintana against the wall in the property room, and Lieutenant Gordon's uses of excessive force when he punched Mr. Quintana in the head in the property room, and did nothing to attempt to stop any of these acts.

223.    Lieutenant Gordon's, Officer Fillmore's, Officer Menjares', Officer Santana's, and FTO Higgins' acts and omissions were the direct and proximate cause of the violations of

Mr. Quintana's constitutional rights and resulted in bodily injury, pain, suffering, mental distress, anguish, humiliation, and medical and other expenses.

224.    The acts and omissions of Lieutenant Gordon, Officer Fillmore, Officer Menjares, Officer Santana, and FTO Higgins, acting under color of state law, were made intentionally and maliciously and were designed to and did cause physical injury, pain, and suffering in violation of Mr. Quintana's constitutional rights.

<u>**COUNT IV**</u>
**42 U.S.C. § 1983 – *MONELL* POLICY, PRATICE, AND CUSTOM CLAIM**
**(AGAINST HILLSBOROUGH COUNTY)**

225.    Mr. Quintana incorporates by reference, as if set forth fully herein, all other paragraphs of this complaint.

226.    At all times relevant to this complaint, Hillsborough County had in effect de facto policies, practices, customs, and usages resulting in the violation of Mr. Quintana's constitutional rights.

227.    At all times relevant to this complaint, Hillsborough County had developed informal "customs" of allowing the use of excessive force, the failure to follow VSJ's Use of Force policy, the failure to intervene to prevent the use of excessive force, and the failure to report uses of force.

228.    At all times relevant to this complaint, those informal "customs" were so widespread as to have the force of law.

229.    Hillsborough County acted with deliberate indifference to the strong likelihood that allowing the use of excessive force, the failure to follow VSJ's Use of Force policy, the

failure to intervene to prevent the use of excessive force, and the failure to report uses of force would only serve to ratify and encourage that unconstitutional conduct to continue.

230.    Hillsborough County knew or should have known that allowing the use of excessive force, the failure to follow VSJ's Use of Force policy, the failure to intervene to prevent the use of excessive force, and the failure to report uses of force would lead to further improper conduct by its employees and/or agents but, nonetheless, exhibited deliberate indifference to the unconstitutional and illegal conduct.

231.    In the years leading up to the uses of excessive force against Mr. Quintana, other VSJ inmates were subjected to uses of excessive force, including but not limited to an incident which occurred on July 10, 2021, during which an officer, who would later plead guilty to a misdemeanor charge of simple assault for his conduct during the incident, struck a 21-year-old inmate in the face.

232.    At all times relevant to this lawsuit, Hillsborough County had received numerous prior complaints involving uses of excessive force.

233.    Hillsborough County's informal "customs" are further evidenced by the facts detailed above, including but not limited to:

- Lieutenant Gordon, a high-ranking official and Shift Commander, repeatedly and brazenly used premeditated excessive force against Mr. Quintana, in front of and in concert with several other VSJ employees, none of whom made any act at all to intervene, after previously telling Mr. Quintana that he was going to "beat the shit out of him."

36

- A minimum of thirteen VSJ personnel, including two Sergeants, a Doctor, and Lieutenant Gordon, the Shift Commander, had knowledge of the uses of excessive force and did absolutely nothing to report or address them.

- Lieutenant Gordon told Officer Fillmore not to tell anybody about the uses of excessive force, and, until ordered to participate in an internal investigation, Officer Fillmore obeyed his illegal command.

- Officer Fillmore and Officer Menjares made the following statements about their failure to intervene while Lieutenant Gordon punched Mr. Quintana in the head:

  o Officer Fillmore told police that she never told Lieutenant Gordon to stop.

  o Officer Fillmore told police that she was "like a deer in headlights," and "just froze."

  o Officer Fillmore told police that she did not know what to do.

  o Officer Menjares told police that he didn't really focus and just wanted to get out of there.

  o Officer Menjares told police, "I kind of at this point was like I wanna just go … At that point I was like, I didn't even care … not even engaged. I was like, I just wanna go back to work."

  o Officer Menjares told police, "Mind you, this is a guy that's a shift commander. I'm a very low level, entry officer, I just kind of … I don't know, it was very awkward for me, like I said, I didn't even know what to do, I kind of just was like, what the hell? Why am I even here?"

- Officer Menjares told police that he had worked at VSJ for two years, and in those two years, "I have only ever written a report if a supervisor told me to. I never, like, ever did that, it was always like, a Sergeant would tell you or a Lieutenant would tell you, that's how it always was for me since I was there … If nobody ever told me to, I never, never did."

- Lieutenant Gordon advanced aggressively on Mr. Quintana, while Mr. Quintana was in NHSP custody, told him his home address in an invitation to fight outside of VSJ, and drew his OC spray in the booking area in full view of numerous VSJ personnel, none of whom did anything to report or address these out-of-control actions.

- Sergeant Consodine told police that instead of reporting the uses of force he had knowledge about, or Lieutenant Gordon's aggression in the booking area that he witnessed, he joked with Lieutenant Gordon about Lieutenant Gordon being close to retirement.

234.    The complete failure of all VJS personnel with knowledge of the uses of excessive force against Mr. Quintana to contemporaneously report or address them, as well as Officer Menjares' admission to police that he had only ever written a report if a supervisor told him to, suggests standard practices of allowing the use of excessive force, the failure to follow VSJ's Use of Force policy, the failure to intervene to prevent the use of excessive force, and the failure to report uses of force. *See Wood v. Hancock Cnty. Sherriff's Dep't.*, 354 F.3d 57, 66 (1st Cir. 2003).

235.    Moreover, the complete failure of all VJS personnel with knowledge of the uses of excessive force against Mr. Quintana to contemporaneously report or address them supports an inference that all VSJ personnel involved were operating under a shared set of rules and customs. *See Bordanaro v. McLeod*, 871 F.2d 1151, 1156–57 (1st Cir. 1989).

236.    "Absent such a norm, it is highly unlikely such unanimity of action could occur." *Id*.

237.    The conduct of Lieutenant Gordon was so egregious that even a layperson would be aware that it violated Mr. Quintana's civil and constitutional rights, and was so flagrant that it indicates an improper custom because witnessing officers did not intervene on Mr. Quintana's behalf.

238.    The decision by a minimum of thirteen VSJ personnel including two Sergeants, a Doctor, and Lieutenant Gordon, the Shift Commander, to disregard reporting policies demonstrates the establishment of a system which permits VSJ personnel to disregard required reporting policies regarding the use of force. *See Salem v. Stoneham Police Dep't*, 752 F. Supp. 3d 282, 299-300 (D. Mass. 2024).

239.    Officer Menjares' admission that, in his two years at VSJ, he only wrote a report when his supervisors told him to, demonstrates the establishment of a system which permits VSJ personnel to disregard required reporting policies regarding the use of force.

240.    Hillsborough County's informal customs of allowing the use of excessive force, the failure to follow VSJ's Use of Force policy, the failure to intervene to prevent the use of excessive force, and the failure to report uses of force directly resulted in the violation of Mr. Quintana's Eighth and Fourteenth Amendment rights.

241.    Mr. Quintana suffered bodily injury, pain, suffering, mental distress, anguish, humiliation, and medical and other expenses as a result of these actions by Hillsborough County and is entitled to punitive damages.

**COUNT IV**
**STATE LAW – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
**(AGAINST LIEUTENANT GORDON, OFFICER FILLMORE,**
**OFFICER MENJARES, OFFICER SANTANA,**
**AND FTO HIGGINS)**

242.    Mr. Quintana incorporates by reference, as if set forth fully herein, all other paragraphs of this complaint.

243.    At all times relevant to this complaint, Lieutenant Gordon, Officer Fillmore, Officer Menjares, Officer Santana, and FTO Higgins each had a duty to intervene to prevent the violation of Mr. Quintana's Eighth and Fourteenth Amendment rights.

244.    Lieutenant Gordon, Officer Fillmore, Officer Menjares, Officer Santana, and FTO Higgins each were aware of said duty, but nevertheless breached said duty as described throughout this complaint.

245.    These breaches of said duties were extreme and outrageous.

246.    These breaches of said duties caused Mr. Quintana severe emotional distress.

247.    As a direct and proximate result, Mr. Quintana suffered bodily injury, pain, suffering, mental distress, anguish, humiliation, and medical and other expenses,

**RELIEF REQUESTED**

**WHEREFORE**, Plaintiff Orlando Quintana respectfully requests this Court grant the following relief:

A.    Monetary Damages;

B.      Punitive Damages;

C.      Costs, expenses, and reasonable attorney's fees pursuant to 42 U.S.C. § 1988(b)

and New Hampshire law;

D.      All relief available to Mr. Quintana under any applicable law; and

E.      Any other relief that this Court deems just or equitable.


Dated: January 26, 2026

By: /s/ Timothy S. Mainella
Timothy S. Mainella, #278206
SHAHEEN AND GORDON, P.A.
107 Storrs Street
Concord, NH 03301
(603) 749-5000
tmainella@shaheengordon.com
Attorneys for Plaintiff,
Orlando Quintana